JUDGE TUCKER.
The only question is whether an illegitimate child born before the first of January, 1787, of parents who af-terwards intermarried, and the father recognised the *child by his will, is within the benefit of the statute. Being satisfied of both these facts, from the evidence, X shall beg leave lo read my notes in the cases of Stones v. Keeling, (2) decided the 12th of May, *646 1804, and Sleighs v. Strider, (1) the 20th of April, 1805.
JUDGE TUCKER having read these two cases, as inserted in the notes below, concluded with expressing his opinion that the decree of the Superior Court of Chancery was correct, ’ and ought to be affirmed.
*JUDGE ROANE.
There are two questions in this case; 1st. Whether the marriage of the parents of the appellees is sufficiently proved; — and, 2dly. Whether that marriage (being antecedent to the act of 1785) is embraced thereby. As to the first question, I am of opinion, that under the liberality of construction which is allowed in relation to the proof of marriage, and under which this Court acted in the case of Stones v. Keeling, the marriage in question is abundantly proved. The testimony of Elizabeth Stott, Thomas *Coleman, and B. M’Carty, which alone might be sufficient, is confirmed, beyond all question, by the will contained in the record, which not only recognises the plaintiffs as the children of the testator, but also admits a marriage.
As to the second question, it was held in the case of Stones v. Keeling, that the issue of marriages, existing at the time of passing the act, which were deemed null in law were legitimated by the act: and I see no reason for a diversity of construction in relation to the question before us, touching the legitimating bastard children, by a posterior marriage between their parents, under the same section of the act; except what arises from the words, ‘ ‘shall after-wards intermamy,” which might seem to import only marriages to be celebrated in future. That word “afterwards,” however, is more properly to be referred to the birth of the bastard children, than to the passage of the act; and no good reason could possibly have existed with the Eegisl ature, for varying the construction of a section embracing two descriptions of cases standing on a similar foundation. No objection to this construction can arise, in either case, on the ground that the act invades private rights: — at most, in the case before us, it is only a possibility of an interest that is invaded ; a possibility in relation to the children born in wedlock, depending upon their, surviving their father, and his dying intestate. This construction of the act, therefore, however it may be as to the inception of the right, is only prospective as relates to the consummation of it ;• — it applies to cases only where the father has died posterior to the passage of the act. This case therefore varies from that of Elliott v. Lyel:(a) in that case the construction contended for was repelled, as it went to vary the contract of the parties *647 from what it was under the law existing at the time it was entered into.
As to the case of Sleighs v. Strider, I have seen Mr. Call’s note of it. According to that, it would seem that the judgment •was merely affirmed by the Court; and as the appellee’s counsel had contended, (as appears from his statement,) first, that Richard Hall took an estate tail, *which was turned into a fee, by the act of 1776; or secondly, that T. Hall was legitimated by the act of 178S; it does not necessarily follow that the last was the ground of decision upon which the judgment of the Court was founded. I have no doubt, however, of the accuracy of the note of the Judge who preceded me, in relation to what passed in conference on the subject; and on the whole, am of opinion to affirm ths d(?crcc«
JUDGE FDBMING
said it was the unanimous opinion of the Court that the decree be affirmed.

 Stones v. Keeling, May 12th, 1804. MS.
This was an appeal from Suffolk District Court, affirming the grant of administration on the estate of William Keeling, senior, deceased, by the Court of Princess Anne County, to the defendant, Prances Keeling, widow of William Keeling, junior, son of the intestate William Keeling, senior, and mother of the children of the said William Keeling, junior, to whom, since the grant of administration to her, the guardianship of those children has been committed.
The appellants are the husbands of two daughters of the intestate by one Athalia Arbuckle, to whom, it is contended on the part of the appellee, he was never in fact married; or, if he was ever married to her, that she was then the wife of one William Ar-buckle, now living. To this the appellants reply that, were this proved to be the case, (which they deny,) the act of 1785, c. 60, (Rev. Code, c. 93, s. 19,) legiti mates the daughters, who are by virtue tb ereof entitled to a share of the estate, and to the administration as next of kin to the intestate.
Upon the whole of the testimony, I think the fact of both marriages is proved, and, if the question turned entirely upon those facts, I should be of opinion that the judgment of the District Court ought to be affirmed, (a)

 Vide 4 Burr. 2059; 1 Black. Rep. 632; 1 Black. Com. 440, 457; 5 Co. Rep. 98; 2 Black. Com. 436; 1 Salk. 120; 3 Ley. 410; Bull. N. P. 112; 2 Esp. 290.
But the act of Assembly, which declares that the issue of marriages deemed null in law, shall nevertheless be legitimate, does, in my apprehension, apply to the daughters in this case, notwithstanding all that was urged to the contrary. The father did not die until alter the commencement of that act; the rights of the daughter to his property did not commence till his death.
The question as between these parties did not, nor could it exist until that event; and the act was then in full operation. The words null and void are perfectly convertible terms, and mean the same thing. The widow of the son was not entitled to administration in preference to the daughters; had she even administered upon the son’s estate, which does not *646 appear; nor could she, as guardian to the grandchildren, have been entitled to any preference, had she been appointed guardian before administration granted, which was not the case.
The act of 1785, it should be remembered, relates to the disposition of property only; and proceeds to shew who shall be admitted to share the property of a person dying intestate, notwithstanding any former legal bar to a succession thereto; and, in that light, the law ought to receive the most liberal construction: it being evidently the design of the Legislature to establish the most liberal and extensive rules of succession to estates, in favour of all, in whose favour the intestate himself, had he made a will, might have been supposed to be influenced. And here, there can be no doubt, had he died testate, that these daughters would have been the first objects of his care, (a)

 Vide 2 Fonb. 124.
Roane, Judge, concurred.
Fleming, Judge, concurred.
Carrington, Judge, concurred.
Lyons, Judge, concurred.
Judgment reversed May 12, 1804. — Note in Original Edition.

 Sleighs v. Strider, April 20th, 1805. MS.
Appeal from the Winchester District Court.
William Hall devised lands to his son Richard Hall “during his natural life, and no longer; and, after, to his eldest son, and his heirs for ever; but if no male issue, to his eldest daughter and her heirs for ever.” Richard Hall had a natural son born in the year 1776; and, in 1778. married the mother, and re-cognised the child as his till his death in 1796 The father and son, by deed of bargain and sale, conveyed to the defendants. The father afterwards dying, without ever having any other son, but having several daughters; the eldest brought suit for the lands, claiming them under the before mentioned clauses in his grandfather’s will.
Mr. Call, for the plaintiff, insisted,
1st. and 3d. That Richard Hall took an estate for life only; that the limitation to (Elizabeth) his eldest daughter, was good; and that she, on the death of her father, became entitled to these lands; and relied on 1 Salk. 236, 1 P. Wms. 54, S. C. Blackburn v. Edgely, H. 600, 2 Wash. 9, Roy v. Garnett.
Mr. Wickham, contra, relied on the rule in Shelly’s case, 1 Co. 99. 2 Wash. 31, 1 P. Wms. 756.
2d. point. That Thomas Hall, the son of Richard, being born out of wedlock, and before the act of 1785, was not eldest son of R. H. in a legal line, and consequen tly could not take as heir, or under the devise.
This point appearing to me to embrace the whole case, I shall pass over the others: the words of the law are; "where a man having by a woman one or more children, shall afterwards intermarry with such woman, such child, or children, if recognised by him, shall thereby be legitimated."
It is contended that the word shall, being a word importing a thing to be done, or to happen after another thing which is done, or hath happened, must necessarily refer to marriages to be solemnized after the passing of the act; and cannot be construed to have any other relation.
If this be the true construction, the meaning of the law will be the same, whether the word after-wards be inserted therein or not. But will it be said, that, if that word were stricken out, the sense of th e law would be precisely as it is now. The word shall, would in that case indubitably apply to the time of passing the act.
The word afterwards, can never be applied but to a thing spoken of before; the thing spoken of be-forein the act, is the having children born before wedlock; the thing to be done afterwards, is the marrying the woman, and recognising the child.
If the sense contended for by Mr. Call, were the proper sense of the law, the word afterwards, must be construed as the word hereafter; whereas I am confident there is no lexicon in the English language in which it willbe found in thatsense; its synonyme is thereafter.
whenever a past event is spoken of, and another possible event, posterior thereto, is spoken of at the same time; the word shall, never imports a future, in reference to the time of speaking, but a future in reference to the first event only; shall, in all such cases means “shall have.”
The law intending to provide for all cases, generally, this arrangement of the sentence was necessary to embrace every possible case of the kind, and was meant, not only to encourage marriages after the passing of the law, but to protect and provide for the innocent offspring of indiscreet parents, who had already made all the atonement in their power, for their misconduct, by putting the children whom the father recognised as his own, on the same footing as if born in lawful wedlock.
In conference (absente Judge Fleming) the Court were unanimously of opinion that any legitimate son of Richard Hall, the devisee of W. H. who might have been born during the life-time of his father, was capable of taking the lands in question under the devise in the will of the said William Hall; and that Thomas Hall, son of the said Richard Hall, under the operation of the act directing the course of descents, answering to that description, there was no error in the judgment of the District Court.
Judgment affirmed. — Note in Original Edition.

 3 Call, 268.